In re MESABA AVIATION, INC., d/b/a Mesaba Airlines, Debtor.

Mesaba Aviation, Inc., Plaintiff,

v.

Aircraft Mechanics Fraternal Association, et al., Defendants.

Bankruptcy No. 05–39258.
Adversary No. 06–3428.

United States Bankruptcy Court, D. Minnesota.

Oct. 23, 2006.

Alan L. Kildow, DLA Piper Rudnick Gray Cary, Michael F. McGrath, Michael L. Meyer, Will R. Tansey, Ravich Meyer Kirkman & McGrath Nauman, Minneapolis, MN, Kenneth B. Hipp, Lynne T T Toyofuku, Marr Hipp Jones & Wang LLLP, Honolulu, HI, for Debtor.

## ORDER GRANTING PRELIMINARY INJUNCTION IN FAVOR OF PLAINTIFF

GREGORY F. KISHEL, Chief Judge.

This adversary proceeding came on for hearing on October 17, 2006, on the Plaintiff's motion for a preliminary injunction. The Plaintiff appeared by the following counsel: Timothy R. Thornton, of Briggs and Morgan, Minneapolis (arguing), Michael L. Meyer and Will R. Tansey, of Ravich Meyer Kirkman McGrath & Nauman, Minneapolis, and Kenneth B. Hipp, Marr Hipp Jones & Wang, LLLP, Honolulu. The Defendants appeared by the following counsel, each organizational defendant's counsel also noting an appearance for the individual defendants associated with that organization: for the Air Line Pilots Association, International ("ALPA"), James L. Linsey and Joseph J. Vitale, of Cohen, Weiss and Simon, LLP, New York, and James M. Jorissen, of Leonard, O'Brien, Spencer, Gale, & Sayre, Ltd., Minneapolis; for the Association of Flight Attendants–CWA, AFL–CIO ("AFA"), Robert S. Clayman, of Guerrieri, Edmond, Clayman & Bartos, P.C., Washington, D.C., and Joel D. Nesset of Henson & Efron, P.A., Minneapolis; and for the Aircraft Mechanics Fraternal Association ("AMFA"), Nicholas P. Granath, of Seham, Seham, Meltz & Petersen, LLP, Minneapolis, and Lucas Middlebrook, of Seham, Seham, Meltz & Petersen, LLP, New York. The National Mediation Board, as intervenor, appeared by Roylene A. Champeaux, Assistant United States Attorney, Minneapolis. Though not a named party, the Unsecured Creditors' Committee in the Plaintiff's Chapter 11 case appeared by counsel Tim J. Robinson, of Squire, Sanders & Dempsey, LLP, Columbus, and Thomas J. Lallier, of Foley & Mansfield, PLLP, Minneapolis.

The following memorandum of decision on the motion is based on the evidence received at the hearing, certain documentary exhibits received in associated proceedings in BKY 05–39258 as noted herein, and briefing and argument submitted by counsel.

## INTRODUCTION

The Plaintiff ("the Debtor") is a debtor-in-possession in a pending case for reorganization under Chapter 11. Via this adversary proceeding, it requests equitable and declaratory relief against the organizational defendants, which are three labor unions that represent over 1,100 of the Debtor's employees, plus certain of their officers and employees.[1] Most specifically,

---

1. The organizational defendants will be termed, collectively, as "the Unions." The Debtor sues the individual defendants in their official capacity only. The Unions each afforded their affiliated individual defendants a defense to this matter. When appropriate,

it seeks an injunction against the Unions' exercise of self-help, i.e., striking, in the wake of the Debtor's court-authorized rejection of its collective bargaining agreements with the Unions pursuant to 11 U.S.C. § 1113, and the Debtor's subsequent imposition of modified terms of employment, i.e., reductions in the amount of employee compensation and benefits. At this point, the Debtor moves for a preliminary injunction under Fed.R.Civ.P. 65(a), as incorporated by Fed. R. Bankr.P. 7065.

The Debtor is a carrier subject to the Railway Labor Act, 45 U.S.C. § 151 *et seq.* ("the RLA"). The Unions are the authorized bargaining agents for, respectively, the mechanics, the flight attendants, and the pilots whom the Debtor employs. The Debtor's relationship with each union was subject to the terms of a collective bargaining agreement and the RLA's governance when the Debtor filed for Chapter 11.

The Debtor argues that, upon its rejection and imposition, the intertwining of substantive law under the Bankruptcy Code, specifically § 1113 and the RLA, deprives the Unions of a present right to strike. It then argues that that circumstance overrides those terms of the Norris–LaGuardia Act, 29 U.S.C. § 101 *et seq.* ("NLGA"), that otherwise deprive the federal courts of jurisdiction to enjoin a union's right to self-help—thereby making its requested relief available in this forum. In turn, the Unions maintain that the NLGA trumps all authority cited by the Debtor, as to them individually or collectively, because no other law prevents them from striking. Thus, the Unions argue, they must be free to strike as a response to any imposition of modified terms by the Debtor.

These arguments frame up the several issues presented on the Debtor's motion. There is almost no on-point case law authority treating most of the issues, as they arise from the very specific facts and postures of the parties at bar. There is none at all as to at least one issue.

## PROCEDURAL HISTORY

1. The Debtor filed a voluntary petition under Chapter 11 in this Court on October 13, 2005.

2. In late November, 2005, the Debtor's management approached representatives of the Unions, requesting the Unions' consent to modifications of the terms of compensation and benefits and various "work rules" under the several collective bargaining agreements. The Debtor was seeking to substantially reduce its ongoing labor costs, as a part of its reorganization in bankruptcy. The Debtor made these overtures to initiate a so-called "pre–1113 process," trying to get these costs reduced via voluntary concessions from the Unions without having to seek formal authorization from the Bankruptcy Court to reject the collective bargaining agreements under 11 U.S.C. § 1113. By late January, 2006, the "pre–1113 process" had not resulted in agreements to modify the terms of employment.

3. On February 3, 2006, the Debtor filed its motion under § 1113, seeking authority to reject the collective bargaining agreements and to impose the modified terms of employment it had proposed, without the Unions' consent. After an expedited discovery process and continuing efforts by the Debtor and the Unions to reach a consensual modification, the motion came on for an evidentiary hearing. The hearing ultimately spanned one calendar month, from late February to late

references to the Unions collectively or individually will subsume the organization(s) and the individual officer(s) or employee(s) of each, jointly.

March, 2006, consuming fifteen days of actual time in-court.

4. After the record was closed on the motion, the Debtor continued to negotiate with one or more of the Unions. Pending that negotiation, the Debtor and all of the Unions stipulated to successive extensions of the due date for the Court's decision on the motion that was otherwise applicable under 11 U.S.C. § 1113(d)(2). When the parties would no longer stipulate to an extension, the Court rendered its decision on May 18, 2006. The Court found that the Debtor had met its burden on most of the recognized elements of § 1113, but denied the motion on three stated grounds. The decision was later reported as *In re Mesaba Aviation, Inc.*, 341 B.R. 693 (Bankr.D.Minn.2006).

5. The parties continued their negotiations after that. At the same time, the Debtor took action to address the three deficiencies in its case for § 1113 relief, as a hedge against the failure of negotiation.

6. After the post-decision negotiations did not produce consensual modifications, the Debtor filed a second motion under § 1113, on June 12, 2006. This motion came on for an evidentiary hearing that ultimately consumed three days of in-court time, on June 26–28, 2006. During the hearing, the Debtor produced unrebutted evidence that there had been no change in its financial position and business prospects from those that prevailed at the time of the first hearing.

7. After the record was closed on the second motion, the parties continued to negotiate. On July 14, 2006, the Court rendered decision on the second motion, holding that the Debtor had remedied the defects of its first motion, had now proved up all of the elements of § 1113, and was now entitled to reject and impose. That relief was accorded by an order entered on the same date.

8. The Unions took an appeal from that order to the United States District Court. After an expedited administration of the appeal, the District Court (Davis, J.) rendered a decision on September 13, 2006, currently reported as —— B.R. ——, 2006 WL 2739046. The District Court affirmed this Court on all but two issues that had been treated in the July 14 order, reversed as to those two issues alone, and remanded for further proceedings consistent with its opinion.

9. In the meantime, the Debtor had continued efforts toward negotiation with one or more of the Unions. It continued them after the District Court's decision. Those efforts did not produce consensual modifications of any union's collective bargaining agreement.

10. On September 29, 2006, the Debtor filed a motion to reopen the record on its second motion, to address the two issues on which the District Court had remanded. At a hearing that consumed two days of in-court time, the Court granted the motion, reopened the record, and received evidence and argument on those issues.

11. After the record was closed on that stage of the § 1113 proceedings, the Court scheduled a hearing for October 12, 2006, to read a decision onto the record. In the meantime, the Debtor continued to negotiate with at least one of the Unions. On October 12, over the objections of the Debtor and its Unsecured Creditors' Committee, the Court granted the Unions' request to defer the rendering of decision until Monday, October 16, 2006, to allow the Debtor and the Unions to engage in intensive negotiations over the following weekend. At the AFA's counsel's request, the Court ordered the Debtor's counsel to execute a "reservation of rights" letter in favor of the AFA, to preserve the AFA's right to raise a technical but substantial

issue in further proceedings if no accord was reached. The Court ordered this in deference to the AFA's professed willingness to participate in good faith in the subsequent negotiations, as long as its rights were so preserved.

12. The Debtor and the Unions then engaged in lengthy negotiations over the weekend of October 13–15, 2006. On Monday, October 16 all parties attested to having made at least "some progress"; but none of the Unions had reached agreement with the Debtor on modifications of employment terms during these sessions.

13. On October 16, 2006, the Court rendered decision on the Debtor's renewed request for § 1113 relief, and granted it. An order according that relief was entered on the same date, authorizing the Debtor to reject and impose effective at 12:01 a.m. on Wednesday, October 18, 2006.

14. On the contingency that it would receive the relief it had requested under § 1113, the Debtor had commenced this adversary proceeding on October 2, 2006, by filing its complaint and the motion at bar. It did not specify the date and time of a hearing in its notice of motion. The Court then reserved time on October 13 for any hearing that would become necessary, in light of whatever disposition the § 1113 request received. The Unions timely filed a consolidated response to this motion, as directed by the Court. When the Court deferred the rendering of decision on the § 1113 matter, the reserved setting was continued to October 17.

15. The motion at bar thus came on for hearing on October 17, 2006. After nearly seven hours of in-court time, the Court closed the record and determined that the gravity and novelty of the issues required the matter to be taken under advisement. In order to preserve the status quo, the Court directed from the bench that the effective date of the Debtor's authorization to reject and impose would be deferred to a point in time after the rendering of decision on the motion at bar.

16. In the meantime, between the grant of § 1113 relief and the convening of the hearing on the motion at bar, the Debtor's representatives had continued to meet with various Union representatives to negotiate on consensual modifications to employment terms—but to no successful conclusion with any of the Unions.

## FINDINGS OF FACT

### On the Maintenance of the Debtor's Business Operations and the Community.

1. The Debtor is a regional airline. Its sole source of business is the performance of airlink services to Northwest Airlines ("Northwest") under an Airline Services Agreement.[2] As such, the Debtor primarily feeds passengers from smaller and more remote cities, mostly in the northern United States and central Canada, into Northwest's three hub locations. It uses smaller aircraft to transport them. The Debtor is the only provider of air passenger service to nineteen of those cities, six of which are in Minnesota. The United States Department of Transportation has designated the Debtor as the "Essential Air Service" provider to nine of these cities. All of these are communities in areas where the maintenance of air service essential to the community's well-being is deemed "at risk" on the operation of private market conditions, and for which the Debtor thus receives a federal subsidy for its provision of service.

---

**2.** For further detail, historical and present, see *In re Mesaba Aviation, Inc.*, 341 B.R. at 704–706.

2. An abrupt cessation of the Debtor's flying operations would leave many of these communities under severe economic and social disadvantage until substitute service provision could be arranged. Air transportation service deemed "Essential" by the United States Department of Transportation would be halted. Further, during the days and weeks immediately after a cessation of operations, it would discommodate numerous individual passengers with existing travel arrangements that would have been fulfilled on flights serviced by the Debtor.

### On the Debtor's Current Financial Condition.

3. The Debtor's most recent cash flow projections, prepared on October 15, 2006 but based on actual experience since September 1, show that the Debtor is still drawing down on its cash balance due to operational deficits occasioned by Northwest's withdrawal of aircraft from the Debtor's fleet.[3] They show that the Debtor will exhaust cash on hand within approximately two months, absent implementation of labor cost reductions in the near future and without the Debtor obtaining post-petition operating capital from a third party. Absent cash from some other source, this would prevent the Debtor from sustaining operations through the negotiation, proposal, and confirmation of a plan of reorganization.

4. The Debtor has no source of new capital or non-revenue funding, other than the post-petition borrowing given final court authorization on September 20, 2006. The lending agreement for that financing provides, at § 4.02(i),

> (i) Labor. The Borrower shall have either (i) obtained Tentative Agreements with each of its labor unions, in each case on terms reasonably satisfactory to the Agent or (ii) imposed new terms with the labor union employees consistent with the terms of the Bankruptcy Court's order dated July 14, 2006 securing relief under Section 1113(c) of the Bankruptcy Code.

*In re Mesaba Aviation, Inc.,* BKY 05–39258, Doc. No. 857, pg. 84.[4] The Debtor needs to access this credit to continue its going concern.

5. Thus, if the Debtor does not implement labor cost reductions in a stable ongoing work operation in the near future, its effort at reorganization will end soon and it will have to terminate going-concern operations.

### On the Prospects of a Strike if the Debtor Rejects and Imposes.

6. Before the end of March, 2006, all three of the Unions had completed those internal procedures necessary to authorize their leadership to call a strike against the Debtor, if the Debtor were to reject their collective bargaining agreements under § 1113 and to impose modified terms of employment.[5] Since late March, 2006, the leadership of one or more of the Unions has publicly announced a firm willingness

---

**3.** These projections were received into evidence under seal in the last hearing on the Debtor's request for § 1113 relief, on October 10, 2006, as Exhibit 1122. The exhibit is incorporated into the record for the motion at bar.

**4.** The Court has taken this document into the record for the motion at bar.

**5.** This was established as a matter of fact in the disposition of the Debtor's first motion under § 1113, 341 B.R. at 747. Indeed, it was a centerpiece of one of the Unions' theories in defending that motion: that the prospect of a strike post-rejection and -imposition so portended to end the Debtor's going-concern operation that rejection could not possibly be found "necessary to promote" the Debtor's reorganization. *See* 341 B.R. at 747–748 and 758.

to call a strike against the Debtor upon a rejection and imposition. This only reprises past pronouncements from union leaders at the local and international levels.[6]

### On the Consequences of a Strike, for the Debtor's Maintenance of Operations.

7. The regulations of the Federal Aviation Administration require newly-hired pilots and flight attendants to go through a period of training that is so extended that the Debtor could not replace an operating complement of these employee groups on short notice.

8. The length of time necessary to obtain a new full complement of trained pilots and flight attendants would require the Debtor to ground its current flight operations, were it to lose the service of the current members of these employee groups.

9. Were the Debtor to cease ongoing operations, other constituencies in the case—in particular its Unsecured Creditors' Committee—would move this Court for relief structured to minimize further loss of the value of the assets of the bankruptcy estate.[7] A grant of such relief could entail a court-ordered cessation of current operations and could ultimately lead to the liquidation of the estate's assets. This would permanently cease the Debtor's going concern.

10. Termination of the Debtor's going concern would result in every single one of the Unions' members losing employment with the Debtor. All of the Debtor's other employees would lose their employment also. The Debtor had nearly 2,300 nonunionized employees when it filed for Chapter 11.

11. These consequences would occur if any given union, or all of them, were to engage in a complete walk-out.

12. If a given union were to engage in the sort of "sporadic strike" contemplated under the AFA's trademarked "CHAOS" strategy, under which the AFA members would refuse service without notice on a particular flight, throughout a particular day or other time period, or out of a particular airport, the impact on the Debtor's operations could be devastating. The Debtor would lose all revenue derived from the particular flight operations affected by such a job action. There would also be a negative impact on the public's perception of the Debtor's ability to provide reliable service, and the real (but presently unmeasurable) prospect of a consequent reduction in passenger bookings on flights that the Debtor services for Northwest.

13. Inability to provide service to Northwest due to flight interruption would fail the performance standards under the Debtor's Airline Services Agreement with Northwest. Northwest then could exercise rights under the Airline Services Agreement or under 11 U.S.C. § 365 in its own Chapter 11 case, to terminate the Debtor's service provision to it. This would deprive the Debtor of virtually all of its future income.

### On the Debtor's Status with the Unions Under the Terms of the Railway Labor Act.

#### As to AMFA.

14. The Debtor's last negotiated collective bargaining agreement with AMFA, dated August 16, 1999, reached the end of its stated four-year duration on August 16,

---

6. *See* 341 B.R. at 758.

7. See Exhibit 1100 supporting the Debtor's last request for § 1113 relief, received under

seal on October 10, 2006. This exhibit is incorporated into the record for the matter at bar.

2003, and "became amendable" under the terms of the RLA.

15. Both the Debtor and AFMA served so-called "Section 6 Notices" in February, 2003. Under Section 6 of the RLA, 45 U.S.C. § 156, this commenced a period of bargaining between them over amendments to the terms of employment of AMFA's members as they lay under the 1999 collective bargaining agreement. In the meantime, AMFA's members were legally bound to the terms of the 1999 agreement.

16. The Debtor and AMFA conducted this "Section 6 bargaining" until April, 2004.

17. In April, 2004, the Debtor and AMFA both filed applications with the National Mediation Board ("NMB") for mediation under the RLA. The NMB docketed a case for mediation between those parties on April 16, 2004, and assigned a mediator to it.

18. Bargaining between the Debtor and AMFA with the participation of that mediator continued until November, 2005, when the Debtor made its first overture under § 1113 to AMFA.

19. The Debtor and AMFA went into a process of negotiation without the involvement of the NMB mediator, with the express understanding that they were acting under § 1113. This process continued through early July, 2006. The NMB mediator was aware of this.

20. Between then and the intense bargaining sessions conducted over the weekend of October 13–15, 2006, the Debtor and AMFA had ongoing negotiation contacts on an intermittent basis, with some involvement by a NMB-employed mediator, Patricia Sims, as initially requested in July by the Debtor. AMFA has disputed whether these sessions are to be considered as proceeding under Section 6. The

Debtor and AMFA have not agreed on a specific legal characterization of the mediator's role.

21. Since April, 2004, however, no one on behalf of the NMB has ever communicated to the Debtor or AMFA that the NMB had released those parties from the mediation process under the RLA that was commenced at that time, or otherwise formally announced that the mediation under Section 6 was terminated.

*As to the AFA.*

22. The Debtor's last negotiated collective bargaining agreement with the AFA, effective on April 1, 2002, reached the end of its stated four-year duration on March 31, 2006, and then became amendable.

23. On December 1, 2005, the AFA served a Section 6 Notice on the Debtor, requesting commencement of negotiation under the RLA over terms of employment. The Debtor served a Section 6 Notice on the AFA on December 14, 2005.

24. During January, 2006, the Debtor and the AFA exchanged written communications on the issue of whether their ongoing negotiation sessions would satisfy the requirements to meet under both § 1113 and Section 6. On January 11, 2006, Sarah O. Wang, Esq., representing the Debtor for the negotiations, expressed the Debtor's intention that "the parties' ongoing bargaining ... be pursuant both to the pre 1113(c) process *and* to Section 6 ..." (emphasis in original). In making this statement, Wang was specifically concerned that the statutory process under Section 6 not terminate in consequence of the *de facto* conduct or frequency of the parties' ongoing meetings, whatever those turned out to be. On January 20, 2006, Mark C. Stotik, a staff attorney for the AFA, expressed the AFA's agreement "that the meetings between the parties in connection with the Section 1113 negotiations are ef-

fective *for the purposes of tolling the Section 6 meeting requirements ...*" (emphasis added).

25. Between mid-January and very early March, 2006, representatives of the Debtor and the AFA met on several occasions to exchange information or to conduct bargaining on modifications of terms of employment. On at least three occasions between late December, 2005 and early March, 2006, more than ten days elapsed between the close of one such face-to-face session and the beginning of another. During this time, neither party raised an issue with any such lapse of time, or refused to continue bargaining in consequence of one having occurred.

26. On Sunday, March 5, 2006, after the commencement of the month-long court hearing on the Debtor's first § 1113 motion, the Debtor and the AFA conducted an out-of-court negotiating session. The Debtor had made another modification proposal to the AFA. At the end of this session, the participants discussed the setting of another session. Stotik advised Wang that he was unable to meet the following day, March 6, could do it "maybe Tuesday or Wednesday," and "would get back to" Wang for the scheduling of another session.

27. At that time, the court sessions on the Debtor's motion were entering a pattern of long days and very contentious conduct by litigation counsel. Wang was in attendance in court on some of these days.

28. By March 15, Stotik had not contacted Wang on the matter of scheduling another bargaining session, and the Debtor and the AFA had not conducted such a session. Before the end of the calendar day on March 15, Wang tried to reach Stotik by telephone to discuss the matter. Stotik did not answer; Wang left a voicemail message expressing the Debtor's wish to schedule another session and asked him to contact her. Stotik did not return the call. Via an e-mail message to Stotik datelined Thursday, March 16 at 4:09 a.m.,[8] Wang stated that she was "follow[ing] up on the voice mail message," and asked "please advise when the AFA would like to meet for further bargaining."

29. Stotik did not respond to either Wang's telephone call or her e-mail communication.

30. On March 16, 2006, David A. Borer, the AFA's General Counsel, sent a letter to Cynthia M. Surrisi, one of the Debtor's litigation counsel on § 1113 issues. In it, he observed that "the last ... meeting between the parties [pursuant to the Section 6 Notices] occurred on March 5, 2006"; that at 12:01 a.m. on March 16 the parties had begun "the 11th day, since the last bargaining session"; and that "[n]o request for services of the NMB ha[d] been made by either party." He then opined that "[a]s of today the parties have therefore exhausted the procedures of Section 6 of the Railway Labor Act," in consequence of which "AFA [would] be free to exercise its right to strike without further constraints, if any, under Section 6," if the Debtor were to "implement unilateral changes to the AFA collective bargaining agreement following the conclusion of the 1113 process."

31. This is the sum of communications between the Debtor and the AFA, on the matter of whether they were proceeding in bargaining under Section 6 after March 5, 2006.

---

8. The time assigned here may have been that fixed by an e-mail server located in Hawaii. The law firm representing the Debtor's interests in the § 1113 process in this case has its offices in Honolulu.

32. At no time up to the issuance of Borer's letter of March 16 did either the Debtor or the AFA communicate to the other that it was unwilling or unable to conduct further negotiations under Section 6, or that their Section 6 negotiations were then terminated.

33. On March 20, 2006, counsel for the Debtor filed an application for mediation with the AFA under Sections 5 and 6 of the RLA, with the NMB. In the cover letter for the application, counsel detailed the parties' dealings just noted, and other events and contacts surrounding them.

34. On March 21, 2006, the NMB issued a notice to the Debtor and to the AFA that it had docketed a mediation case for the dispute between the Debtor and the AFA, and would be assigning a mediator to it who would contact the parties to set up mediation sessions.

35. Since that time, the mediator assigned by NMB has attempted on a number of occasions to procure the attendance of both the Debtor and the AFA at mediation sessions under the NMB's auspices. These efforts have included at least two directives to appear at specific places and times for such sessions.

36. Through its counsel or representatives, the AFA has refused to participate in such sessions throughout, and has failed to appear as directed. Its counsel and representatives have communicated that it will not do so before the Debtor, the AFA, and the NMB all executed a document under which the AFA would reserve its right to assert the termination of Section 6 procedures after March 15 in any proceeding in which the continuing applicability of Section 6 to the parties' relationship might be raised. At one point, the Debtor was willing to execute such a "reservation of rights letter," but ultimately the NMB's representative refused to so commit the NMB.

37. Due to the AFA's refusal, and due to that only, the Debtor and the AFA did not participate in any session of negotiation or bargaining, under color of either § 1113 or Section 6, from at least early summer until those conducted on and after October 13, 2006, under the Court's sanction and with a reservation of rights between the Debtor and the AFA only.

38. By communication made through counsel for the United States, the NMB, through its mediator, stands ready to commence sessions under Sections 5 and 6 of the RLA with the Debtor and the AFA at any time.

*As to ALPA.*

39. The Debtor's last negotiated collective bargaining agreement with ALPA was executed on January 30, 2004, with an effective date of January 31, 2004, and a five-year duration. Its Section 31, titled "Duration," provides that it is to "continue in full force and effect until January 31, 2009," and to "renew itself without change" for annual periods thereafter, "unless written notice of intended change is served in accordance with Section 6, ... by either party ... at least ninety (90) but not more than one hundred fifty (150) days prior to January 31, 2009 or any January 31st thereafter."

40. On October 16, 2006, after the Court rendered decision on the Debtor's request for relief under § 1113, the Debtor (through William T. Poerstel, its Vice President of Flight and Technical Operations) sent a letter to Captain Duane E. Woerth, then President [9] of ALPA, Inter-

---

9. By an election conducted during mid-October, 2006, Woerth was voted out of the office of President of ALPA. Liz Fedor, *Inside track:*

*Another union leader falls,* Minneapolis *Star Tribune,* October 23, 2006, p. D1; *Pilots un-*

national. In it, Poerstel summarized the status of the § 1113 proceedings in court, noting that the Debtor was now authorized to reject the ALPA collective bargaining agreement and to impose terms of employment on ALPA's members in accordance with the prescriptions of the Court's order. He went on to recite that, "[p]ursuant to Sections 2 and 6" of the RLA, the letter "was to notify you of [the Debtor's] intent to meet for the purpose of amending the Imposed Terms as well as other terms of the [ALPA collective bargaining agreement] and other terms of employment for the [Debtor's] pilots represented by ALPA."

41. Also on October 16, 2006, after the Court's ruling on the Debtor's request under § 1113, the Debtor filed an "Application for Mediation Services" with NMB on NMB's form, as to ALPA. The Debtor identified the "specific issue(s) in dispute" for the mediator as "Rates of Pay, Hours of Service, and Working Conditions." A copy of Poerstel's letter to Woerth is attached to this Application.

42. Per John Spanjers, the Debtor's Chief Operating Officer, the purpose of these documents is "to start negotiations with" ALPA under the auspices of Section 6 and mediation through the NMB, in the wake of the Debtor's post-rejection imposition on ALPA's membership of new terms of employment. At the evidentiary hearing on the motion at bar, Spanjers stated that it was still the Debtor's hope to obtain a consensual resolution with ALPA before rejection and imposition or after it. He stated that the Debtor would reject and impose as soon as court-authorized *if it* had not settled with ALPA before then, given the Debtor's dwindling cash reserves and the need to access court-authorized post-petition financing that is contingent on a resolution of the issue of labor cost reductions.

## DISCUSSION

### Introduction.

This is only the second time that a controversy of the type at bar has been presented to a court. The first time was not too long ago and (figuratively) not too very far away. The forum proceeding was the Chapter 11 case of Northwest Airlines, this Debtor's airlink partner, which is venued in the United States Bankruptcy Court for the Southern District of New York. The result (so far) is the decision of the United States District Court for the Southern District of New York, *In re Northwest Airlines Corp.*, 349 B.R. 338 (S.D.N.Y.2006), on appeal from the decision of the United States Bankruptcy Court for that district, *In re Northwest Airlines Corp.*, 346 B.R. 333 (Bankr. S.D.N.Y.2006).

The outcome on appeal in *Northwest Airlines* was in favor of the debtor-employer; the union in question—the AFA—was enjoined by the District Court from initiating its CHAOS procedure or otherwise exercising self-help in consequence of Northwest's rejection and imposition. Though the District Court-level decision in *Northwest Airlines* was barely a month old when the parties here argued the matter at bar, all participants structured their arguments in reaction to it. The Debtor here, of course, gave a resounding endorsement to the rationale of the District Court in *Northwest Airlines*. The Unions' counsel made a blistering attack on it, noted its non-precedential character in this forum, and urged the adoption of the analysis at the Bankruptcy Court level in *Northwest Airlines*.

*ion elects new president*, St. Paul *Pioneer Press*, October 19, 2006, p. 2C.

Both published decisions from the Northwest controversy are reasoned at length, and each is thoughtful and cogent in its own way. The differences in approach, reasoning, and result are not out of expectation for an issue of first impression. The quality of the two courts' work is an added benefit for any forum facing the same problem (though the competing cogency makes it difficult to immediately "choose between them," in an intuitive fashion). Because of the exhaustiveness of each court's treatment, and the fact that each one resonates with what appear to be all relevant considerations, it is entirely appropriate to use these decisions and their analysis as both springboard and structure for the resolution of the motion at bar.[10]

### The Main Dispute.

From the standpoint of this Court's authority over the parties, the issue may be phrased as follows. Does the Norris–LaGuardia Act, 29 U.S.C. § 101 *et seq.*, deprive this Court of jurisdiction to enjoin the Unions from striking; or, is this one of those uncommon cases where equitable relief will lie in a federal court, notwithstanding the NLGA's generalized proscription, to restrain a union from avoiding "status quo" responsibilities under the Railway Labor Act? More narrowly, but more colloquially, the latter question is whether the Unions will have a right under the RLA to exercise self-help, i.e., to strike, if the Debtor exercises its court-granted authority to reject their collective bargaining agreements, and then imposes terms of employment on the Unions' members that are less favorable than those fixed by the pre-petition agreements.

As the District Court in *Northwest Airlines* analyzed it, the answer involves three statutory sources of substantive legal governance, and at least implicates a fourth. This is not surprising; as a collective forum to address systemic financial failure,[11] bankruptcy implicates many different sorts of legal relationships and interests. In the case at bar, we have the Debtor, which seeks to preserve an ongoing business operation under a restructured set of financial, contractual, and legal obligations that would restore it to operational solvency and long-term viability. We have the interests of creditors, secured and unsecured, that seek to ensure as much of a return on their pre-petition investment in the Debtor's operations as they can get, in light of the Debtor's financial distress. And we have the Unions, which seek to protect their members' entitlements under consensual pre-petition collective bargaining agreements, and wish to exercise their rights on any deemed breach of those agreements.

Not a one of these goals is inappropriate in isolation, and not a one of these interests is invalid. The difficulty in any Chapter 11 case, of course, is that, by the nature of the beast, *there is not enough to go around* to satisfy all of the pre-petition expectations of all parties.

■ Bankruptcy law thus provides the forum and the principles to "parse out the portions of defeat,"[12] in a rateable manner

---

10. And, in the last instance, the extreme exigencies of time here do not permit a new "building-from-bricks" approach to the analysis. For that matter, the situation here does not really warrant a completely new treatment, given the relative similarities to *Northwest Airlines* and the comprehensiveness of the thought process of the two courts there.

11. *In re Mesaba Aviation, Inc.*, 341 B.R. at 756; *In re Oak Park Calabasas Condo. Ass'n*, 302 B.R. 665, 673 (Bankr.C.D.Cal.2003).

12. The phrase is that of the late Richard M. Arnold, Judge and Chief Judge of the United States Court of Appeals for the Eighth Circuit,

under the priorities established by Congress and with the utilization of various ancillary remedies. But bankruptcy does not provide the sole substantive governance of that parsing. When parties become subject to the bankruptcy process, their relationships are already established and governed by non-bankruptcy substantive law. That law continues to have significant vitality for the resolution of disputes in the bankruptcy case, if it is not expressly displaced by clear provisions of the Bankruptcy Code. *United Airlines, Inc. v. HSBC Bank USA, N.A.*, 416 F.3d 609, 615 (7th Cir.2005) ("... the norm in bankruptcy law is that contracts ... and property rights in general have the same force they would in state court, unless the [Bankruptcy] Code overrides the state entitlement"); *In re Madeline Marie Nursing Homes*, 694 F.2d 433, 439 (6th Cir. 1982) (ditto); *In re MJK Clearing, Inc.*, 371 F.3d 397, 401 (8th Cir.2004) (state law governs the resolution of property rights in a bankruptcy case).

Thus, in the case at bar, we have a debtor-employer in a specialized and complex industry, its relations with its employees and their bargaining representatives being governed by nearly a century's worth of established statutory law subject to its own judicial construction.

That law includes the NLGA, 29 U.S.C. § 101, *et seq.* The NLGA opens with its general directive that "[n]o court of the United States ... shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in strict conformity with the provisions of this [Act]," 29 U.S.C. § 101. Then it goes on to detail in terms more proscriptive than prescriptive the implications of that statement on jurisdiction, for a union's right to strike its members' employer.

Then there is the RLA, which prescribes a lengthy, "almost interminable,"[13] process, "an elaborate machinery"[14] for the renegotiation of collective bargaining agreements and for the resolution of disputes between railway or air carriers and their labor unions, one that is "purposely long and drawn out."[15] That process must be exhausted before a union has the right to strike. Pending that, both sides have the overriding duty to maintain the status quo of their performance on subsisting terms of their contractual relationship. *See In re Northwest Airlines Corp.*, 349 B.R. at 362, 2006 WL at 2642194 *17.

And there is the Bankruptcy Code, specifically § 1113, which gives a debtor-employer the right to undo its own duties of performance under a current collective bargaining agreement, without identifying on its face the consequences on the duties of performance of organized employees or their bargaining representatives.[16]

---

a superbly accomplished jurist and a memorable speaker.

**13.** *Detroit & Toledo Shore Line R.R. v. United Transp. Union*, 396 U.S. 142, 149, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969).

**14.** *Id.* at 148–149, 90 S.Ct. 294.

**15.** *Id.* at 149, 90 S.Ct. 294.

**16.** The unions in both *Northwest Airlines* and here also made argument based on the National Labor Relations Act, 29 U.S.C. § 151 *et*

*seq.* However, as the District Court in *Northwest Airlines* held, the very different substantive provisions of the RLA govern a transportation carrier's labor relations, and the terms of the NLRA specifically exempt an employer subject to the RLA from the governance of the NLRA. 29 U.S.C. §§ 152(2) and (3). Thus, cases decided under the NLRA are not good authority on the issues presented here. 349 B.R. at 372, 2006 WL 2642194, *26–27. As a result, even though it was rendered by a court that creates precedent binding on this one, *In re Briggs Transp. Co.*, 739 F.2d 341 (8th Cir. 1984) is simply not applicable here; the em-

All three of these statutes are now in play in this case, because the Bankruptcy Code does not provide for the unseating of the governance of either of the other two. All of the parties here recognize this; they have taken that into account in structuring their arguments on the Debtor's motion. The conundrum, however, is what to do if the text of these applicable laws does not neatly mesh by explicit cross-reference on its face.

The two courts in *Northwest Airlines* elected different approaches. They split at the point where each characterized the character of an employer's act of rejection-and-imposition pursuant to § 1113, insofar as it bore on the mutual and ongoing status quo obligations of parties bound by the Railway Labor Act, and as it would trigger any consequent right to self-help on the part of the union. *Compare* 346 B.R. at 344 (in employer-union relationships governed by the RLA, "apt analogy" for post-rejection imposition under § 1113 "would be to an employer's unilateral action in changing the status quo that in turn frees the employees to take job action") with 349 B.R. at 381, 2006 WL 2642194, *35 and 33 (debtor-employer's rejection and imposition under § 1113 "should not be deemed an arbitrary, unilateral contract change" by employer under contemplation of RLA; hence union has continuing duties under the RLA to maintain status quo and to go on with RLA dispute resolution process).[17]

To get there, the District Court in *Northwest Airlines* took cognizance of the purposes of the remedy of rejection of collective bargaining agreements in bank-

ruptcy under § 1113, ultimately to "promote the reorganization" of financially stressed business enterprises and to put them on a firmer footing for long-term survival as going concerns. 349 B.R. at 382, 2006 WL 2642194; *34–35. *See also In re Mesaba Aviation, Inc.,* 341 B.R. at 730–731 (citing and quoting *In re Carey Transp. Inc.,* 816 F.2d 82, 89–90 (2d Cir. 1987)). The *Northwest Airlines* District Court noted that in the context of an insolvent airline in Chapter 11, this purpose coincided with the RLA's goal of avoiding the disruption of operations that would result from unionized employees' self-help. 349 B.R. at 381, 2006 WL 2642194, *34–35. It then concluded that the substantive structure of § 1113 and the process by which relief under it is obtained, through a neutral third party (the court) via procedures that are intensely participatory with organized labor groups, and as presumptively deferential to employees' prior contractual expectations as both are, cannot be considered to be "arbitrary"; thus, that an employer's invocation of § 1113 to obtain the right to modify terms of employment if negotiation fails cannot be considered as "arbitrary, unilateral, or unlawful," or "taken in bad faith," at all. 349 B.R. at 364, 2006 WL 2642194, *17–19.

Thus, construing these two statutes in a common context of application but fully and exclusively in light of each other's policy underpinnings and essence and not just the *results* of their application, enabled a construction in which the consummated use of § 1113 in a bankruptcy case properly segued the parties over into the involved dispute resolution mechanisms of

ployer there was subject to the NLRA and not the RLA.

**17.** In the larger sense, their approaches resulted in the priming of different (and outcome-inconsistent) policy goals of the competing applicable legislation—the Bankruptcy

Court's result resonating much more with the anti-interventionist measures of the NLGA and a union's reserved right to strike, the District Court's giving conclusive deference to the RLA's goal of dampening and defusing disruptive labor strife in vital transportation industries.

the RLA, with both sides going forward to deal together within changed confines produced by the use of § 1113, but without the destructive confrontation of a strike. 349 B.R. at 382, 2006 WL 2642194, *35. After that, "the modification [of terms of employment upon imposition] is essentially temporary; the debtor carrier can implement the necessary changes only until the parties bargain to a new contract," and, "[i]f, ultimately, there is an impasse," after the RLA "process is exhausted the parties may engage in self-help," *then.* 349 B.R. at 382, 2006 WL 2642194, *36. Thus, "the union does not lose its right to strike ... [it] is only deferred until the end of the [RLA] process ..." *Id.*

But most to the point of both the Bankruptcy Code's and the RLA's policy goals,

> [i]n the meantime, there is opportunity, through further negotiation and mediation, to reach an agreement that could in acceptable ways take into account any loss that may have temporarily been experienced by reason of the § 1113 Order.

*Id.*

■ When presented with a multiple overlay of skewed statutory governance, the court's job is to do just this, to view the terms, policies, purposes and structures of the applicable laws as a whole and to read any clashing provisions in a manner that endeavors to accommodate each of them as much as possible, to this end giving effect to each statute and allowing them to coexist insofar as they are not irreparably at odds. *Id.* at 345*2 and 373*27 (citing *F.C.C. v. NextWave Personal Communic., Inc.,* 537 U.S. 293, 304, 123 S.Ct. 832, 154 L.Ed.2d 863 (2003)). And, contrary to ALPA's counsel's accusation,[18] Judge Marrero, the author of the District Court opinion in *Northwest Airlines,* was proper in essaying that reconciliation, given the Supreme Court authority that he relied on.[19]

The Bankruptcy Court's analysis in *Northwest Airlines* is accessibly written and eminently readable, bolstered by invocation of logic and underlying principles, and resonant with a certain sense of "fair is fair," in a confined frame of reference. Nonetheless, the more global perspective of the District Court's analysis is far more consonant with the larger mission of judicature. And, it has the attraction, not insignificant, of promoting the continuing use of calm, measured, and rational dispute resolution procedures, as mandated in a general way by the applicable law, before any party has its resort to the rough-and-tumble of divisive and disruptive economic confrontation. On full consideration, the rationale and analysis of the District Court opinion in *Northwest Airlines* is the one to be applied in ruling on the motion at bar.

### Application: The Right to Self–Help.

#### *As to AMFA.*

■ As applied to AMFA, the District Court's analysis in *Northwest Airlines* directly supports the conclusion that AMFA

---

18. The drift of counsel's commentary on the methodology of the District Court's *Northwest Airlines* decision was that it drew on an arbitrary extraction of scattered provisions from one law here, one law there, melding them into a rationale that had neither pattern, logical flow, nor warrant in the underlying law. The characterization is far from fair—or accurate.

19. For an example of how the Eighth Circuit Court of Appeals undertook to harmonize the application of several facially-incongruous statutes in the context of an employer's motion for an injunction against a strike, see *Burlington Northern Railroad Co. v. United Transp. Union,* 848 F.2d 856 (8th Cir.1988) (applying Norris–LaGuardia Act, Railway Labor Act, and Interstate Commerce Act).

is not entitled to strike, if the Debtor rejects and imposes when it is authorized.[20]

■ First, when the Debtor entered Chapter 11, it and AMFA clearly were still in active mediation through the offices of the NMB pursuant to Sections 5 and 6 of the RLA. And, nothing in the record for this motion would support a finding or ruling that they are not still subject to an obligation to continue those procedures. The NMB mediator has not released the parties from the process on a conclusion that "further efforts to bring about a settlement through mediation will be unsuccessful." [21] That objective third-party action is the determinant of whether they are still "in Sections 5 and 6." [22]

■ Given that, AMFA has a continuing statutory duty under Section 2, First of the RLA, 45 U.S.C. § 152, "to exert every reasonable effort to make and maintain" an agreement with the Debtor, "in order to avoid any interruption to commerce ..." In this context that means continuing to participate in the NMB's process until a consensual resolution of AMFA's differences with the Debtor, including those over the terms of imposition, or until the end of the pending effort to get that, as determined solely by the mediator. Until that point, AMFA would not have a right to exercise self-help under the very terms of the RLA, and any prospect that it would

is subject to injunction under the direct analysis of the District Court's decision in *Northwest Airlines.*

### As to the AFA.

The AFA's situation raises a very different issue, one that implicates the substantive provisions of the RLA as they have been construed by the courts.

Unquestionably, up to March 5 the Debtor and the AFA were "in Section 6," and to be considered as in a pre-mediation phase of negotiation. It does not matter whether (as the Debtor would have it) they were under joint color of that process and § 1113, or (as the AFA apparently would have it) the procedural requirements of Section 6 were being "tolled" consensually.

The AFA's position is that its Section 6 process with the Debtor was done once the day of March 15 ended without the actual convening of another face-to-face negotiating session before then, or the making of an agreement that one could be held after that without terminating the prior governance of Section 6.[23] This, it says, brought the RLA's whole process of pre-strike dispute resolution to an end, and invested the AFA with the right to self-help if the Debtor rejected under § 1113 and imposed. Thus, it insists, any strike action on its part would not be prohibited by law,

---

20. Under an order entered on October 20, the Court deferred the date on which the Debtor would be authorized to implement § 1113 relief to 12:01 a.m. on Thursday, October 26, 2006.

21. The quoted illustrative language is from Michael E. Abram, et al, eds., *The Railway Labor Act* 329 (2d ed.2005).

22. Abram, et al, *The Railway Labor Act* 329 (NMB has "considerable flexibility to structure mediation as it sees fit, including ... the timing of a release, and any preconditions imposed on release") and 330 (timing of re-

lease from mediation is within NMB's discretion, as long as it "does not engage in patent official bad faith").

23. As articulated, this position is inconsistent with the AFA's position taken in writing, that the Section 6 process would be "tolled"—that is, suspended in some fashion—as it appears to presuppose that the ongoing negotiation sessions were in fact under color of Section 6 as well as § 1113. The inconsistency is of no real moment, though it does underline a certain haziness in the AFA's earlier legal theorization.

and the Debtor is not entitled to an injunction against it.

■ This argument, however, is not supported in either fact or law. Before negotiations under Section 6 can be deemed to have terminated, triggering the ten-day window for formally requesting mediation through the offices of the NMB under Section 6 of the RLA, there must have been "a clear and unequivocal communication [by one party] to the other party that it has terminated conferences." Abrams, et al., *The Railway Labor Act* at 325; *United Transp. Un. v. Delaware & Hudson Ry. Co.*, 977 F.Supp. 570, 575 (N.D.N.Y.1997). Under direct and cross-examination, David Borer, the AFA's General Counsel, could testify to no such statement having been made by any representative of the AFA. All he could say was, as to March 5, "[w]e negotiated that day, that negotiation ended … We probably said goodbye at the end of the day, and the negotiations ended." He admitted that no one on behalf of the AFA ever said anything like "[t]he negotiations are over," or "[t]he conference is terminated."

Under the authority cited, only such an objective manifestation will trigger the duty to timely move on to the next stage of the RLA dispute resolution process. No representative of the AFA made any such statement. The mere *de facto* lapse of time, ten days or whatever, between the actual conduct of Section 6 negotiation sessions is irrelevant. So, despite Wang's belated pains to get something committed for a schedule within the ten days after

March 5, the mere passage of that time did not terminate the informal process of Section 6 negotiations between the Debtor and the AFA. The AFA's—and in particular Borer's—reliance on the mere passage of ten days' worth of time without contact between sessions is quite unsupported under the law.[24]

■ This means that the operative event for the next stage of the RLA process was the *Debtor's* conclusion that the negotiations had terminated following Borer's confrontive assertion to the effect that the whole RLA dispute resolution process had ended. Thus, the Debtor's application to the NMB was not untimely. The AFA and the Debtor were both subject to that office's authority once it had docketed a case for their dispute. And, because the NMB has not released the parties,[25] these parties are still very much engaged in the process of Sections 5 and 6 of the RLA. And, being there at only a nascent point in the NMB's involvement, they are subject to its mediator's full authority.

As a result, the AFA has no more right to exercise self-help in the event of the Debtor's rejection and imposition than AMFA does. The AFA's threatened action to implement CHAOS or any other form of self-help is just as subject to restraint under the persuasive authority of *Northwest Airlines*.

### As to ALPA.

■ Once the determination as to the status of the RLA dispute resolution pro-

---

**24.** Aside from the fact that the word "termination," as used in the statute, clearly denotes an affirmative act, the *Delaware & Hudson* court's construction makes good sense in context—and this flatly defeats Borer's technically-fussy position. If the whole purpose of the dispute resolution exercise under the RLA is *flexible* bargaining, deeming an ongoing consent to participation absent a clear expression

of withdrawal is the way to promote it. It discourages clandestine ambush that would rocket the parties forward into hostile confrontation.

**25.** Anything but—as evidenced by the NMB's mediator's dogged but unsuccessful attempts through the very recent past, to get an AFA representative to just show up.

cess was made for AMFA and the AFA, the analysis under *Northwest Airlines* as to both of those unions was straightforward: their positions *vis-à-vis* the Debtor, and all parties' subjection to the ongoing governance of the RLA, was on all fours with that of the AFA as against Northwest.

The threshold aspect of ALPA's status under the RLA's dynamic, however, is different. The Debtor and ALPA are not currently engaged in a dispute resolution process under color of the RLA, over the terms of employment of ALPA's members. Under the duration clause of ALPA's collective bargaining agreement as applies today, neither party may induce the commencement of such a process, until mid-2008.[26] The District Court in *Northwest Airlines* put some repeated emphasis on the fact that the AFA and Northwest were then actually engaged in RLA dispute resolution on a current, and ripe, issue of the amendment of a collective bargaining agreement. That court did not expressly make that status an essential ground on which it accorded relief. Nonetheless, this difference in legal posture under the RLA means that the rationale of *Northwest Airlines* should not be perfunctorily applied as to ALPA.

However, upon post-rejection imposition by the Debtor, the duration clause under the 2004 ALPA collective bargaining agreement will be supplanted by that under the Debtor's terms, as authorized by the Court.[27] Under the new duration clause, the right to commence Section 6 procedures is open-ended: "… a written notice of intended change may be served by either party in accordance with Section 6 …." The terms of imposition delete the 2004 agreement's specification of a window in time for the filing of such notices to trigger the possibility of amendments.

By its facial language, Section 6 itself does not limit the right of either carriers or unions to give "written notice of an intended change in agreements" to any particular time during the effectiveness of a current agreement, or to any point in time at all.[28] So, under the post-imposition

---

**26.** Section 152, Seventh of the RLA mandates that:

> No carrier … shall change the rates of pay, rules, or working conditions of its employees, as a class, as embodied in agreements except in the manner prescribed in such agreements or in [45 U.S.C. § ] 156 …

As applied here, this means that the Debtor, at present, is statutorily barred from altering the terms of ALPA's members' employment, other than in accordance with the duration clause of the 2004 ALPA collective bargaining agreement. The text of that duration clause, as quoted earlier, bars either party from serving a Section 6 notice to start a renegotiation of terms of employment until the date 150 days prior to January 31, 2009, at earliest. This means that the Section 6 notice served upon ALPA on October 16, 2006, was invalid; it could not commence the RLA dispute resolution process, in itself.

**27.** The language of the post-imposition duration clause for all three unions is set forth in Debtor's Exhibit 1126, received into evidence in connection with the Debtor's last request for § 1113 relief. This Exhibit is incorporated into the record for the matter at bar.

**28.** Under the observation of the author(s) of one treatise,

> [s]ervice of a timely notice to *reopen* a collective bargaining agreement under Section 6 … initiates … all of the steps set forth in the Act to resolve such disputes.

Abram, et al, *The Railway Labor Act* at 323 (emphasis added). This reference clearly envisions a free "reopening" of contractual terms of employment, quite at odds with what is presented here. As later reading in the treatise reveals, the apparent discrepancy is resolved with reference to history: "In the railroad industry, contracts historically have been negotiated without fixed duration …. and in the absence of a contractual restruction the parties may serve a Section 6 notice seeking to modify the contract at any time." *Id.* at 375.

duration clause for ALPA against the backdrop of the RLA, either party may act under Section 6 to propose a change to the terms of imposition or to otherwise resolve any pending dispute as to them, immediately after they become effective. They may simply request that the other party renegotiate a reopening and amendment of existing terms, at any time. If the other party disputes the propriety of an amendment or making amendments generally, both sides will be subject to the RLA's process under Sections 6 and 5 thereafter.

 This loops back around to the issue of whether ALPA would have a present right to strike upon imposition by the Debtor, as follows. As the District Court in *Northwest Airlines* held, a court-authorized rejection of a collective bargaining agreement and subsequent imposition of terms in accordance with an employer's proposal that passed muster under § 1113 "does not constitute an act of bad faith, or an arbitrary or otherwise unlawful change of the status quo" for the purposes of the RLA. 349 B.R. at 362, 2006 WL 2642194 at *17. Consequently the acts of rejection and imposition, *in themselves,* do not trigger an exception to a union's obligation to refrain from self-help without first satisfying the requirements of the RLA.

Here, the new duration clause would immediately open up ALPA's right to commence a dispute resolution process under Section 6 and 5, if it takes exception to the terms of imposition once they are effective. Both at the instant of rejection-and-imposition and on an ongoing basis under the new terms of employment, there will be a status quo with an accessible mechanism

for resolution of either party's contention with any term of that status quo. If the parties get to the NMB in that process,

> . . . the NMB is uniquely positioned to assess the new, lawfully authorized status quo that emerged from the operation of the § 1113 order and to decide how, if at all, negotiations should proceed under the altered baseline.

*Id.* at 379*32. All of this is consonant with the RLA.

This reasoning demonstrates that Judge Marrero's rationale is not limited to the situation where the RLA-governed debtor-employee and its union are involved in a *pending* process under Sections 5 or 6 when court-authorized rejection-and-imposition takes place. The intense, exacting, court-regulated nature of the process for obtaining § 1113 relief takes the implementation of such relief outside the prohibition of Section 2, Seventh of the RLA. In turn, a ready availability of RLA dispute resolution in the wake of such employer action gives an outlet to dispute any incident of the post-imposition terms of employment, or even all of them. The union's and the employer's duty to make "every reasonable effort to make and maintain agreements" must be performed, and through that process. *Id.*

Because ALPA will have both the duty to make that effort and an outlet to resolve its disputes with the Debtor over any aspect of the post-imposition terms of employment, it will have no present right to strike under the RLA at or after rejection-and-imposition. As a result, any strike

---

However, employers and unions subject to the RLA can use contract—the text of their collective bargaining agreements—to delimit the right to push for a change of the status quo, rather than suffering the possibility of continual efforts at renegotiation of an agreement that is itself open-ended. This is done

through so-called "moratorium clauses" in the railroad industry, and "duration clauses" in the airline industry. *Id.* at 375–378. The Debtor and ALPA put such limits into the 2004 agreement, via the duration clause with its "amendable date," *see id.* at 376–378.

action by ALPA, being in violation of the RLA, is as subject to injunction as any by AMFA or the AFA.

## Prerequisites for Issuance of Preliminary Injunction, General and Specific

▮ The adoption of Judge Marrero's reasoning in all its length and detail, and its match to the matter at bar, arguably give warrant to stop there; the District Court's decision in *Northwest Airlines* covered the considerations for issuance of an injunction applicable under general procedural rules, and the dictates of substantive enactments as well, and they are very close to being on all fours with the situation here. Nonetheless, with equity generally dictating a tailor-making of relief to specific facts, and with applicable statute requiring specific fact-finding, it is appropriate to discuss why the issuance of an injunction is warranted, on the facts just found and on the substantive rulings just made.

In the Eighth Circuit, interim equitable relief may be granted on a showing under the long-standing *Dataphase Systs.* test, involving four different considerations. *See Dataphase Systs., Inc. v. CL Systs., Inc.,* 640 F.2d 109, 113 (8th Cir.1981).

▮ Under *Dataphase Systs.*, the proponent of an injunction first must show the threat of irreparable harm to occur if an injunction is not issued. In a dispute involving a party's compliance with duties under the RLA, however, it is not necessary to make "the customary showing of irreparable injury" to obtain injunctive relief against a violation of the RLA's duty to maintain the status quo. *Consol. Rail Corp. v. Ry. Labor Execs.' Ass'n,* 491 U.S. 299, 303, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989).[29]

Were it incumbent on the Debtor to make the showing, however, the finding that the Debtor would be unable to maintain going-concern operations in the event of a general walk-out, would lose revenue and conceivably all future business from Northwest in the event of a CHAOS-styled intermittent strike, and in either event would almost certainly have to terminate its reorganization effort, meet the requirement. Massive job losses, economic and social detriment to many outlying and metropolitan communities, and serious erosion in the value of recovery by the Debtor's creditors in the bankruptcy process would all result.[30] Under all the circumstances, the second factor of the balancing of the harms favors the Debtor as well, especially as the fiduciary advocate of the bankruptcy estate. The variety and depth of potential damage to result from a strike was detailed in the evidence. In any event, it is clearly to be inferred from the basic facts.

To be sure, those of the Unions' members who would remain in the Debtor's employ voluntarily after imposition would

---

29. The Supreme Court's holding makes every bit of sense. The RLA was structured and enacted on a tacit legislative finding that the social and economic effects of unmediated labor strife in vital transportation industries are invariably broad, serious, and persisting, locally and nationally. *Detroit & Toledo Shore Line R.R. v. United Transp. Un.,* 396 U.S. at 148, 90 S.Ct. 294 (observing that Railway Labor Act was passed "in order to prevent, if possible, wasteful strikes and interruptions of interstate commerce").

30. In this regard, the Unions are properly bound by judicial estoppel on the gravity of the outcome of a strike, having longly and loudly insisted that one would be "devastating" to all constituencies. And, given their members' and leaders' past and present expressions of a resolve to do just that, and to bring about that result if they have to, there is no gainsaying causality or consequence.

undergo deep cuts in income, with all that portends for their families and households.[31] But, in light of the context, what really is the alternative? The Unions may have given no deference to this Court's findings on the necessity of the depth of the cut underlying the Debtor's proposals, even after the District Court's affirmance despite the Unions' best shot on appeal. They have continued to resist on this point in bargaining, regardless of repeated rounds of new and uncontroverted courtroom evidence to document that the Debtor has continued to draw down its cash reserves and the remaining lifespan is very limited.

But the only viable implication is that absent the measure of imposition, operations would be shut down, and this case would go into liquidation. That would not have to occur for a month to perhaps three months hence, but that duration is so short that the deferral is meaningless.[32] Continuing to have a job, at whatever reduced compensation, is not as detrimental as losing employment with the Debtor entirely, to employees who may have no other immediate job alternative, or to those who choose to stay for the duration. And, though unquestionably a harm to remaining employees, suffering the imposition under the restraint of an injunction does not outweigh the harm to all constituencies, *employees included,* that would result from the denial of an injunction and the Unions' election to strike.

The probability of success on the merits, when the whole controversy is presented at the later stage of a request for perma- nent injunction, is the most problematic *Dataphase* factor here. There is a near-total lack of on-point authority; several complex statutes must be applied, whether in overlap or not; and powerful and facially-antithetical legislative policies are ostensibly in clash. Individual judges can differ in the weight to be assigned to variant approaches to these imponderables, evidenced quite pointedly by the differing outcomes at the trial court and the first-rung appellate levels in *Northwest Airlines.* The whole concatenation of issues is before a court here for only the second time in history, and the *Northwest Airlines* decisions are the only two extant analyses of these issues.

Nonetheless, given the length, depth, and logical consistency of Judge Marrero's treatment, it has such cogency that it can be safely said that this factor favors maintaining a prestrike status quo via preliminary injunction as well. Per counsel's representation—some of those attorneys' firms being directly involved in it—the AFA's appeal in *Northwest Airlines* is on an expedited schedule for presentation to the Second Circuit. This promises another appellate treatment of the matter in the not-too-distant future. Given both the novelty and the potential recurrence of the issue in other cases, promoting its further development within this circuit as well favors an injunction. In the meantime, and to the extent that this Court can weigh in on it given the conclusions against the Unions thus far, this *Dataphase* element favors the Debtor.

---

**31.** This eventuality has been a haunting omnipresence throughout the § 1113 litigation. See 341 B.R. at 759 n. 100. Even now it is never far from the thoughts of any participant, including the Court.

**32.** The AFA's counsel's attempt to raise this point as an argument against an immediate grant of injunction cannot be taken seriously at this point. Things have changed monumentally since the Unions' counsel started their unrelenting opposition to the Debtor's courtroom efforts eight months ago. Simply stated, the money is almost out—and it was not, back then.

Finally, there is the public interest. This factor is usually not a significant consideration when it must be applied in any multi-factor test in a bankruptcy case. However, the circumstances presented here, patent and uncontroverted, push it right to the fore; it is almost overwhelming by comparison to its usual salience in bankruptcy, where the disputes almost always are "purely private" in nature.

These parties have been engaged in their private disagreement for nearly a year; they began by rattling around in "pre–1113" and went up to several rounds of brutal head-butting in court. Nonetheless, it has only been with the third go-round under § 1113 that isolated local communities serviced by the Debtor have taken notice of the consequences of a strike by the Debtor's unions, at least as per regional media reports, and their officials are concerned. The public interest in multiple sectors is invariably affected by the outcome here. Congress's longstanding recognition of the need to bolster uninterrupted service by the transportation carriers it subjected to the Railway Labor Act virtually compels the conclusion: the public interest, the well-being of local and regional economies, supports enjoining a strike at this time, in the interim at least, until the parties have gone through RLA dispute resolution procedures.

The Unions' counsel also argue that the Debtor had the burden to meet the Norris–LaGuardia Act's requirements for issuance of an injunction against a strike, set out at 29 U.S.C. § 107. Of those five elements, three overlap with the *Dataphase Systs.* factors, those in 29 U.S.C. §§ 107(b), 107(c), and 107(d). There is no contest over the requirement of 29 U.S.C. § 107(e)—"[t]hat the public officers charged with the duty to protect the [Debtor's] property are unable or unwilling to furnish adequate protection"; the Un-

ions have not even raised the point, and it really does not even apply by its terms.

■ The only party to even raise the requirement of 29 U.S.C. § 107(a) was AMFA. AMFA's witness, Kevin Wildermuth, chair of its negotiating committee for the Debtor, testified that the union's Acting National Director had the sole authority to actually call a strike on the local's past vote to authorize one, if the Debtor imposed. Because that power reposed solely in that official, Wildermuth himself did not "know to a certainty that there would be an AMFA strike if the company impose[d]." This testimony was cited by counsel for an argument that the Debtor had not demonstrated that "unlawful acts" on the part of AMFA, though threatened, would in fact *be* committed, as ostensibly required by Section 7 of the NLGA, 29 U.S.C. § 107(a). This argument is only so much semantic dissimulation. It would leave the control over the issuance of an injunction entirely to the pronouncement of one of the persons to be enjoined, and would create the strong possibility of irreparable harm being occasioned when that person made the election to go ahead to strike, after the first denial of an injunction. Any subsequent grant of injunction would have to push a rock back up a hill.

■ In closing argument, the AFA's counsel raised one other point under the NLGA, via 29 U.S.C. § 108. This statute provides:

> No restraining order or injunctive relief shall be granted to any complainant who has failed to comply with any obligation imposed by law which is involved in the labor dispute in question, or who has failed to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental ma-

chinery of mediation or voluntary arbitration.

As counsel noted, the Supreme Court has likened this to the immemorial requirement of equity, that the proponent have "clean hands." *Bhd. of R.R. Trainmen v. Toledo Peoria & W. R.R.*, 321 U.S. 50, 66, 64 S.Ct. 413, 88 L.Ed. 534 (1944). Most of the circumstances counsel cited to tar the Debtor as having unclean hands are a tiresome repetition and extension of the accusations of gamesmanship, hoodwinking, stonewalling, and underhandedness that the Unions repeatedly threw at the Debtor throughout the § 1113 litigation, particularly when the Debtor's conduct in ongoing negotiations was at issue. Most of these were already addressed in the rulings under § 1113, that the Debtor had satisfied that statute's procedural requirements. To the extent that counsel was continuing the game of "Mesaba did this bad thing, Mesaba didn't do that good thing," these all can be dismissed as unfounded, inapt in context, or going to actions that were legally and procedurally warranted in the effort to proceed against the Unions' ongoing resistance to coming to agreement closer to the Debtor's terms. The Debtor has complied with its obligations imposed by law (§ 1113 and the RLA) and has made every reasonable effort to settle its disputes (by lengthy attempts at bargaining).

■ The one that departed, however, was the AFA's insistence that the Debtor had an obligation to exhaust RLA dispute resolution procedures *after* rejection-and-imposition, *before* it could come to a court for equitable relief. As the AFA would have it, the Debtor's motion and even this whole adversary proceeding are premature at this point.

In disposition of this pitch, we first have the incongruity of the AFA, a party that failed and then refused to continue voluntary Section 6 negotiation after March 5, now saying that the Debtor is somehow out of bounds for not now pushing the same process before the NMB—where it would be the only player willing to unqualifiedly submit. *Cf. Chi. & N.W. Ry. Co. v. United Transp. Un.*, 402 U.S. 570, 583, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971).

But beyond that, one should make no bones about this argument: it is designed to shunt the rationale of the District Court's decision in *Northwest Airlines* into innocuousness, by twisting the decision's own frame of reference. The Supreme Court has never judicially imposed any such exhaustion requirement in the cases that countenance an RLA-based exception to the NLGA's prohibition on enjoining a strike. The Unions have not cited any decision from any other court. Corollary authority suggests the contrary. *Bhd. of Maint. of Way Employees v. Un. Pac. R.R. Co.*, 358 F.3d 453, 458 (7th Cir.2004) (employer's refusal to engage in "expedited" arbitration under RLA does not defeat its showing under Section 8 of the NLGA; "... the law requires that a party make every *reasonable* effort, not every *conceivable* one").

■ Under the jurisprudence that both parties cite, injunctive relief is to be accorded against a party that is violating *its own* status quo obligations under the RLA, precisely to veer such a party back around into the procedures of Sections 6 and 5. And that is what would happen here. In point of fact, the injunction here is to position the Unions so as to comply with *their own* status quo obligations under the RLA, which they are on record as opposing. Counsel for all three of them made the threat in oral argument, that the Debtor's imposition "would end all talks." So, clearly, the thought is that they would strike, until the Debtor caved and gave them the concessionary package that they

demanded (and regardless of whether that was feasible). Compliance with Section 6 in conjunction with this simply is not in their contemplation. Holding the Debtor to the futile exercise of so trying before seeking an injunction makes no sense. It would only be a large club to induce the Debtor not to impose as it has been authorized to do. There certainly is no bar to an injunction now under § 108 of the NLGA or on this tenet of general equity.[33]

## CONCLUSION

And thus this matter reaches its end, at least for now. The Debtor is entitled to an injunction against the organizational defendants and the appropriate individual defendants,[34] restraining them from conducting or procuring any *concerted* self-help upon the Debtors' rejection and imposition.[35]

Given the exception of Fed. R. Bankr.P. 7065, the Debtor will not be required to post a bond.

And once again, some observations are warranted, because this request for equitable relief grew so quickly out of the much longer proceedings under § 1113.

As a reflection of the fact that there is never enough to go around in a Chapter 11 case, the Debtor is not in a position to bargain all the way down to the level of cuts that the Unions insist on. It never

has been, notwithstanding its recent election to retreat from its longstanding labor cost reduction goal by 1.9 percentage points in an effort to break the deadlock in negotiations with the Unions.[36] This illustrates the horrible paradox inherent in § 1113: to satisfy § 1113(b)(1)(A), a debtor's initial proposal to a union must reduce employees' pre-petition contractual rights no more than that necessary to "permit the reorganization" of the debtor. But, if the union does not accept this first proposal, § 1113(b)(2) obligates the debtor to *continue to* bargain with the union in order to support any request for judicial relief under § 1113 that it may eventually require to survive.

If the overall cost reduction underlying the first proposal is the minimum that the debtor needs to survive—as § 1113(b)(1)(A) certainly seems to require—the ensuing bargaining literally is over rearranging the deck chairs on the *Titanic* (to use a stock phrase).

But this is what the Bankruptcy Code seems to require a debtor to do. And members of unions, recognizing a pattern of interaction very familiar to them from the governance of non-bankruptcy law, fall (perhaps unconsciously) into the mind-set that accompanies the process outside of bankruptcy: surely there is something

---

**33.** At a more gut-level: it is just plain odd that a party that had essayed its own attorney-engineered and technically-minded game of "Gotcha!" in early March of this year, now accuses the Debtor of being predatory and exploitive by jumping forward to a structured equitable remedy.

**34.** Term 4 of the order contains a qualification of the relief the Debtor originally requested, as to two individuals—one ALPA official who was furloughed by the Debtor this past summer as part of its downsizing, and the person who was the president of ALPA's International when this matter was submitted but who will not retain that status for long if

he even still has it. His successor-in-office will be subject to the injunction.

**35.** The text of this injunction will not be applied so as to bar any individual union-member employee from leaving the employ of the Debtor in his or her own right. Nor will it be construed to bar the Unions' exercise of their rights to engage in free speech to the public, via "informational picketing."

**36.** It is not yet clear where the difference will come from via other economies, in the mid- and long range. But that is an issue for another day.

more to hold out for, something more to get, something more that the other side can be induced to give up during the long run of bargaining.

But where there is not, because the backdrop law required the debtor-employer to give its best overall offer on the first shot, there is a dreadful disjunction. That all too easily gives rise to a sense of betrayal on the part of the unionized employees. If their unions' officials do not provide guidance and leadership in light of hard reality, the debtor-employer boxed in by economics and law alike has nowhere to go but to the court. And if the employees remain unconvinced, then it can get ugly in the formal legal proceedings. The antagonism has a synergistic effect, ramping itself up by large increments at each stage in the litigation.

So it went here. As evidenced by the failure to come to consensual agreements to date, the Unions still do not attach any legitimacy to the Debtor's picture of its— and very much *their*—situation. In the last instance, however, the Bankruptcy Court, as an adjudicative body for dispute resolution, must find facts on the evidence that the parties have given to the court, apply the law, and parse out the portions accordingly.

And, the collateral consequences of that—here ripening from a proceeding that has veered far over into arcane areas of labor law—must be what they must be as well. Without predilection, and only after a very difficult and searching evaluation of what is "right," what is "legal," and how they have to intersect, the Court has performed its function in a dispute that has been maddeningly intractable to date.

The parties may do with the results what they may. This is an injunction issued by a federal court, enforceable as appropriate.

There is still hope for this company, but turning that to reality is once again up to the Debtor and the Unions alike.

## ORDER

On the memorandum of decision just made,

1. Pending entry of final judgment in this adversary proceeding, Defendants Air Line Pilots Association, International, the Association of Flight Attendants–CWA, AFL–CIO, and the Aircraft Mechanics Fraternal Association, together with the named individual Defendants in their official capacities as officers, agents, or employees of ALPA, the AFA, and AMFA, and together with their agents, successors, deputies, servants, and employees, and all organizations and persons acting in concert with them, are enjoined from calling, permitting, engaging in, instigating, encouraging, participating in, authorizing, or approving self-help of any kind, including but not limited to any strike, work stoppage, action that Defendant AFA names "Create Havoc Around Our System" or "CHAOS," sick-out, slow-down, or other concerted refusal to perform normal employment duties.

2. All of the Defendants named in Term 1 and all other persons acting in concert with them shall take all reasonable steps within their power to prevent the actions described above, and shall refrain from continuing such actions if commenced.

3. Defendants ALPA, the AFA, and AMFA shall notify, by the most expeditious means possible, all of the employees of the Plaintiff who are members of those organizations, of the issuance, contents, and meaning of this injunction, and shall provide a copy of all such notices to counsel for the Plaintiff.

4. The injunction set forth in Terms 1 through 3 above shall not apply to named Defendant Greg Wertz, that person being no longer in the active employ of the Plaintiff and therefore no longer having official capacity with Defendant ALPA.

5. The injunction set forth in Terms 1 through 3 above shall not apply to named Defendant Duane E. Woerth, upon the end of his term of office as President of ALPA, International; and, upon the end of that person's term of office, this injunction shall apply to the person who assumes the office of President of ALPA, International.

6. Pursuant to Fed. R. Bankr.P. 7065, the Plaintiff need not file a bond as a condition for the effectiveness of this preliminary injunction.